IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

RONALD BLALOCK,                     )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        CIVIL ACTION NO. 5:23-cv-14 (MTT)
                                    )
PACIFIC LIFE INSURANCE              )
COMPANY,                            )
                                    )
            Defendant.              )
_____ )

## ORDER

This case involves two life insurance policies purchased to fund a partnership buy-sell agreement.  When one partner died, defendant Pacific Life Insurance Company claimed that the deceased partner's policy applications contained material misrepresentations and denied the surviving partner's claim for the policies' benefits.  He sued, and Pacific Life has moved for summary judgment.  Doc. 25.  Pacific Life also filed a *Daubert* motion attacking the opinions of plaintiff Ronald Blalock's expert Vera Dolan.  Doc. 26.  For the following reasons, Pacific Life's motion for summary judgment (Doc. 25) is **GRANTED in part** and **DENIED in part** and its *Daubert* motion (Doc. 26) is **GRANTED in part**.

## I. BACKGROUND[1]

On January 21, 2022 and January 25, 2022, Pacific Life issued two separate $1,000,000 life insurance policies (the "Policies") on Jimmie Long's life.  Docs. 25-1 ¶¶

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

4, 6; 29-1 ¶¶ 4, 6.  Blalock, Long's business partner, was the beneficiary and owner of the Policies.  Docs. 25-1 ¶¶ 5, 8; 29-1 ¶¶ 5, 8.  The Policies were purchased "to fund [Blalock's] purchase of their company's shares that Mr. Long's estate would inherit upon his death, pursuant to a Buy-Sell Agreement."  Docs. 25-1 ¶ 9; 29-1 ¶ 9.

## A. Long's Applications

Long submitted his applications for the Policies on January 21, 2022 and January 25, 2022.  Docs. 25-1 ¶ 3; 29-1 ¶ 3.  With his applications, Long filled out one health history questionnaire and two identical medical history questionnaires.  Doc. 25-13 at 10-13, 22-32.  Long gave the following answers to questions regarding alcohol in the health history questionnaire:



Doc. 25-13 at 29.  He gave the following answers to questions regarding alcohol in the medical history questionnaires:

e) 1) Mark the **one** item that best describes your history of alcoholic beverage use.
  ○ Never Used     ○ Totally Stopped     ☑ Use Now
2) If you have "Totally Stopped," indicate number of years since you totally stopped and give date and reason in **DETAILS**.
3) If you "Use Now," answer the following:
  a) How often do you drink alcoholic beverages?
    ☑ Occasionally     ○ 3 or less days per week     ○ 4 or more days per week
  b) When you drink, how many drinks do you consume per day?
    ☑ 3 or less     ○ 4-6     ○ 7 or more

e) 1) Mark the **one** item that best describes your history of alcoholic beverage use.
  ○ Never Used     ○ Totally Stopped     ☑ Use Now
2) If you have "Totally Stopped," indicate number of years since you totally stopped and give date and reason in **DETAILS**.
3) If you "Use Now," answer the following:
  a) How often do you drink alcoholic beverages?
    ○ Occasionally     ☑ 3 or less days per week     ○ 4 or more days per week
  b) When you drink, how many drinks do you consume per day?
    ☑ 3 or less     ○ 4-6     ○ 7 or more

Docs. 25-13 at 10-11, 22-23; 25-1 ¶¶ 10, 12-13; 29-1 ¶¶ 10, 12-13.  His answers to question 3(e)(1) were different.  Docs. 25-13 at 11, 23; 25-1 ¶¶ 12-13; 29-1 ¶¶ 12-13.

When vetting Long's applications, Pacific Life's underwriters requested records from one physician—Long's primary care provider, Dr. Collier Gladin, and for a limited period—five years.  Docs. 25-1 ¶ 19; 29-1 ¶ 19; *see* Docs. 26-1 at 2; 28-10 at 4.  On December 13, 2021 and January 21, 2021, Dr. Gladin recorded "that Mr. Long was consuming alcohol 'socially.'"  Docs. 25-1 ¶ 20; 29-1 ¶ 20.

## B. Contestable Claim Investigation

Long died on May 24, 2022, ironically enough in a collision with a drunk driver.  Docs. 25-1 ¶ 23; 29-1 ¶ 23.  Long died within the Policies' two-year contestability period; therefore, Pacific Life began a "contestable claim investigation to determine if the Policy Death benefit was payable to" Blalock.  Docs. 25-1 ¶¶ 21-22, 25; 29-1 ¶¶ 21-22, 25.

Purportedly because Long's applications sought information for the ten years preceding his applications, Pacific Life, this time, obtained Long's medical records from that ten-year period.  Docs. 25-1 ¶ 27; 29-1 ¶ 27.  And Pacific Life got records from

providers other than Dr. Gladin—Dr. Mary Bell Vaughn, Long's former physician, and

Dr. Sondralyn Fackler, Long's psychiatrist.  Docs. 25-1 ¶¶ 28, 32; 25-30 ¶ 8; 29-1 ¶¶ 28,

32.  The records relevant here are from March 2012 to November 2014:

- March 27, 2012: Long told Dr. Fackler, "I think I am craving less alcohol." Docs. 28-2 ¶ 32; 32-1 ¶ 32.

- July 5, 2012: Dr. Fackler noted that Long "had been 'struggling' with an 'excess' of 'drinking.'" Docs. 28-2 ¶ 33; 32-1 ¶ 33.

- September 10, 2012: Dr. Fackler noted that Long "continues to have a hard time w/binge drinking."  Long told Dr. Fackler, "I need to stop drinking" and "I need something to help me stop drinking."  Dr. Fackler "explained consequences of binge [drinking]."  Docs. 28-2 ¶ 34; 32-1 ¶ 34.

- August 19, 2013: Dr. Vaughn noted "beer in binges 12 pack"; "drinking heavily on binges"; "Alcohol abuse, continuous"; "advised to go rehab for his alcohol abuse." Docs. 25-1 ¶ 30; 29-1 ¶ 30.

- September 3, 2013: Naltrexone[2] prescription from Dr. Fackler was filled.  Docs. 25-1 ¶ 40; 29-1 ¶ 40.

- October 3, 2013: Long told Dr. Fackler he "believed [n]altrexone had been helpful for alcohol."  Docs. 28-2 ¶ 36; 32-1 ¶ 36.

- November 14, 2013: Dr. Fackler noted that "Long was no longer taking [n]altrexone because he wanted 'to do this on [his] own.'"  Docs. 28-2 ¶ 37; 32-1 ¶ 37.

- May 30, 2014: Dr. Vaughn noted Long's blood pressure "was 'elevated due to drinking beer on vacation.'"  Docs. 28-2 ¶ 31; 32-1 ¶ 31.

- October 30, 2014: Dr. Fackler noted: "Patient was seen in a follow up appointment today.  He reported that overall he had been feeling well.  He continues to work long hours in his construction business.  Patient continues to experience strong urges to periodically binge drink.  He reports this happens on a 1-2 week basis, 1 night weekly.  Patient reports that his energy level increases during the course of the week to the point that he is 'going to explode'.  Explored multiple options for treatment of mood symptoms as well as anxiety and agitation.  Patient feels he would like to take a pm medication as opposed to a daily medication.  Explored

---

[2] "Naltrexone is used to help narcotic dependents who have stopped taking narcotics to stay drug-free.  It is also used to help alcoholics stay alcohol-free."  Doc. 25-7 at 2.

the possible use of a benzodiazepine for control of his escalating anxiety during the week.  Patient was in agreement with a trial of Valium 10mg [in the] pm.  He is aware of the dangers of alcohol use in combination with Valium.  Patient is willing to try the Valium instead of these drinking episodes and will see if the medication gives him relief of his symptoms."  Docs. 28-2 ¶ 38; 28-3 at 5; 32-1 ¶ 38.

- November 20, 2014: Dr. Fackler noted: "Patient was seen in follow up appointment today.  He appears to be stable and doing well.  He is pleased with the progress of his company and current projects.  He does struggle with hypomanic symptoms which ultimately drive him to drink alcohol excessively.  Patient has agreed to try pm Valium for control of his agitation.  He is aware that he is not to combine Valium with alcohol.  He is pleased with the progress of his company and reports no acute crises.  He is in agreement with treatment plan and plans were made to meet on a weekly basis.  Patient was in agreement with this."  Docs. 28-2 ¶ 39; 28-3 at 6; 32-1 ¶ 39.

For context, Long saw Dr. Fackler about 150 times and spoke about alcohol during seven of those visits.  Docs. 29 at 11; 32-5 at 27-188; 42 at 31:8-21.

On August 23, 2022, Karen Dunbar, Pacific Life's director of underwriting and risk management, emailed "her analysis of the claim" to Lori Hashmi, a Pacific Life claims specialist, stating, in relevant part:

[B]ased upon review of the above 2 files, the UW did not follow the guidelines with respect to an abnormal urinalysis.  They should have ordered 2 additional specimens on 2 different days.  It's unclear what the outcome would have been had that been done.  Given that the applicant has diabetes (not disclosed on app) and hypertension combined with the significantly abnormal urinalysis, they also could have correlated that the abnormality was a complication associated with the control of the 2 conditions and asked for a medical opinion to decline.  Either way the UW was in error on this one.

Additionally had we known about the history of alcohol abuse with physician recommended rehab, unsure if went or not; combined with current consumption, the UW would have declined this case.

…

We have 2 components on this one – UW error and information not disclosed.

Docs. 25-1 ¶¶ 58-59; 25-22 at 2-3; 29-1 ¶¶ 58-59.

Pacific Life completed its contestable claim review on August 26, 2022.  Docs. 25-1 ¶ 60; 29-1 ¶ 60.  The live rescission and contestable claim summaries explained that Pacific Life was rescinding the Policies and denying the claim "due to the misrepresentation in the application," specifically Long's responses to questions about alcohol.  Docs. 25-1 ¶ 60; 25-24 at 2; 25-25 at 2-3; 29-1 ¶ 60.  As for the materiality of those alleged misrepresentations, the contestable claims summary was terse:

> Had we known about the alcohol abuse with advisement by his physician to seek treatment with admitted current consumption of alcohol, per the guidelines, this would be a decline.

Docs. 25-1 ¶ 60; 25-24 at 2; 29-1 ¶ 60; *see* Doc. 25-25 at 2-3.

Typically, Pacific Life relies on "its own internal guidelines, as well as the Swiss Reinsurance ('Swiss Re') guidelines in its underwriting of life insurance policies."[3] Docs. 25-1 ¶ 54; 29-1 ¶ 54.  Although neither Dunbar nor the contestable claims summaries cited to specific underwriting guidelines,[4] it is clear that Pacific Life relied on its own guidelines which, though brief, call for the declination of an application in the event of "current use with a history of treatment for alcohol abuse" or "untreated alcohol abuse."  Docs. 25-24 at 2-3; 25-25 at 2-3; 28-5 at 4.  There is no comparable language in Swiss Re's guidelines.  *See generally* Doc. 28-6.

---

[3] Pacific Life's lawyers "don't know" if Swiss Re was Pacific Life's reinsurer.  Docs. 42 at 70:8-11; 25-25 at 3.  Although Pacific Life's recission decision here was not based on Swiss Re's underwriting guidelines, it is undisputed that Pacific Life generally uses Swiss Re's guidelines.  Docs. 25-1 ¶ 54; 29-1 ¶ 54.

[4] In the "Provisions of UW guidelines which support the materiality of misrepresentation" section of Pacific Life's "live rescission/contestable claim summary," Pacific Life simply stated: "Attached swiss re guidelines and the company note."  Doc. 25-24 at 3.  Pacific Life clarified at the hearing that "the 'company note' is the [Pacific] Life internal guidelines."  Doc. 42 at 13:20-21.

Pacific Life informed Blalock of its decision and returned Long's premium payments on September 20, 2022.  Docs. 25-1 ¶¶ 61-63; 29-1 ¶¶ 61-63.  This letter cited the questions it perceived as answered incorrectly and stated, in relevant part:

> Had Mr. Long answered the questions accurately on the Applications, the Policies would have been returned to Pacific Life for underwriting approval.  Thereafter, upon reviewing Mr. Long's records, Pacific Life would have declined to issue the Policies.  Thus, Pacific Life considers the misrepresentations and omissions on the Applications to be material to undertaking its risk to insure Mr. Long.

Docs. 25-1 ¶¶ 61-62; 25-26 at 3; 29-1 ¶¶ 61-62.

## C. Procedural History

Blalock sued Pacific Life on January 13, 2023 for breach of contract and bad faith refusal to pay the death benefits.  Doc. 1 ¶¶ 22-46.  Pacific Life moved for summary judgment on both claims and filed a *Daubert* motion to limit Dolan's opinions.  Docs. 25; 26.  The Court held a hearing on both motions on February 27, 2024.  Doc. 41.  All but one issue raised by Pacific Life's *Daubert* motion were resolved by consent.  *See* Docs. 41 at 2; 42 at 74:15-75:2.

## II. STANDARD

## A. *Daubert* Motion

Federal Rule of Evidence 702 requires district courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.  *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589 n.7 (1993).  "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis and alteration in original) (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir.

2002)).  This analysis requires the Court to "consider whether: (1) [T]he expert is qualified to testify competently regarding the matters [she] intends to address; (2) the methodology by which the expert reaches [her] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*., 326 F.3d 1333, 1340-41 (11th Cir. 2003) (first alteration in original) (quoting *City of Tuscaloosa v. Harcros Chems*., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).

**B. Summary Judgment**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it 'must support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial.'  In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party."  *United States v. Four Parcels of Real Prop*., 941 F.2d 1428, 1438 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp.*, 477 U.S. at 323). The moving party "simply may show ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (cleaned up). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224-25 (11th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 324).[5]

In determining whether a genuine dispute of material fact exists, the Court "must avoid weighing conflicting evidence or making credibility determinations." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 248. A material fact is any fact relevant or necessary to the outcome of the suit, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Furthermore, "[a]ll material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the

---

[5] Under Georgia law, "[t]o void the policy, the burden rests on the insurer to show that the misrepresentation was material to its acceptance of the terms of the policy" and "the insured bears the burden of proving that the refusal to pay the claim was made in bad faith." *Thompson v. Permanent Gen. Assurance Corp.*, 238 Ga. App. 450, 451, 519 S.E.2d 249, 250 (1999); *Assurance Co. of Am. v. BBB Serv. Co., Inc.*, 259 Ga. App. 54, 57, 576 S.E.2d 38, 41 (2002). Thus, Pacific Life has the burden of proving Long's "representations in [his] application concerning [his drinking] habits were false and that these misrepresentations were material" and Blalock, as the beneficiary, has the burden of showing there is a genuine dispute as to whether Pacific Life's failure to pay his claim was in bad faith. *Jackson Nat'l Life Ins. Co. v. Snead*, 231 Ga. App. 406, 409, 499 S.E.2d 173, 175 (1998).

record shall be deemed to have been admitted, unless otherwise inappropriate."  M.D. Ga. L.R. 56.

## III. DISCUSSION

### A. *Daubert* Motion

The only remaining issue raised by Pacific Life's *Daubert* motion is whether the Court should exclude Vera Dolan's opinion that "Pacific Life is falsely stating that reviewing <u>ten</u> years of medical records at time of claim is fair and justified, when only <u>five</u> years of the most contemporaneous medical records were reviewed at time of issue without any finding of alcohol abuse."[6]  Docs. 26-3 at 16 (emphasis in original); 42 at 74:15-75:2.  Pacific Life argues that Dolan's opinion is based on "speculation" and "unreliable principles and methods."  Doc. 26-1 at 8, 10-12.  The Court agrees.

Dolan has "been involved in the life insurance industry as an underwriter … since 1982."  Doc. 29-10 ¶ 4.  Dolan testified that her opinion is based on the "principle" that during its contestable claim investigation, an insurer cannot rely on medical records older than those requested at the time of application.  Doc. 42 at 60:15-25.  However, Dolan cited no authority, underwriting or otherwise, supporting this opinion, and the Court can find none.  Indeed, Dolan does not dispute that it was appropriate to ask Long about his medical history for the ten years preceding his application for insurance.  *See generally* Doc. 26-3.  Nor does she dispute that Pacific Life could appropriately rely on the truthfulness of the information Long provided when it issued the Policies.  When Long died within the contestable period, the only means available to confirm the

---

[6] At the *Daubert* hearing, Dolan agreed to replace "falsely" in her opinions with "I find no support for Pacific Life's position."  Doc. 42 at 59:23-60:5.

accuracy of that information was to request records from the providers who saw Long during that ten-year period.

Accordingly, this opinion is not the product of reliable principles and methods; rather it is a mere *ipse dixit*, and thus is **EXCLUDED**.

## B. Breach of Contract

Pacific Life argues it is entitled to summary judgment on Blalock's breach of contract claim because it properly rescinded the Policies under O.C.G.A. § 33-24-7(b)(2) and (b)(3), which provide:

> Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless:
>
> …
>
> (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> (3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.

Doc. 25-2 at 4-16. "To avoid a policy under either the second or third prong, 'the insurer need only show that the representation was false and that it was material in that it changed the nature, extent, or character of the risk.'" *Liberty Corp. Cap., Ltd. v. Bhanu Mgmt., Inc.*, 161 F. Supp. 3d 1307, 1316 (S.D. Ga. 2015) (quoting *Haugseth v. Cotton States Mut. Ins. Co.*, 192 Ga. App. 853, 854, 386 S.E.2d 725, 726 (1989)). Although Long's answers to two questions in his applications were false, Pacific Life has not established that those misrepresentations were material as a matter of law.

*1. Falsity*

"O.C.G.A. § 33-24-7 does not require that an insurer prove the insured's knowledge of … the falsity of the misstatement or omission at issue," but an insured's allegedly false answer to an ambiguous "yes" or "no" question in an application cannot later be used to disclaim liability as a matter of law.  *Pope v. Mercury Indemn. Co. of Ga.*, 297 Ga. App. 535, 539, 677 S.E.2d 693, 698 (2009); *Snead*, 231 Ga. App. at 411, 499 S.E.2d at 177; *see Life & Cas. Ins. Co. v. Gaines*, 59 Ga. App. 545, 2 S.E.2d 153, 154 (1939) ("An answer to an ambiguous question is no more than the expression of an opinion as to what the question means.").  The rules of construction governing insurance policies apply to applications for insurance:

> The same rule of construing an insurance policy or bond strongly against the insurer and favorably to the insured applies to an application, or matters contained therein, as to the policy itself, the instrument having been prepared by the insurer.  The insurance company is also under a duty to frame questions in the application so that they will be free from misleading interpretations.  When it has failed to do so, an ambiguity or doubt arises, questions and answers thereto will be construed most favorably to the insured.

*Snead*, 231 Ga. App. at 411, 499 S.E.2d at 177 (citation omitted).  Terms in an insurance application "must be considered … not in the light of scientific, technical definitions but in the light of the insured's understanding in connection with which the terms are employed in the application."  *Gilham v. Nat'l Life & Accident Ins. Co.*, 104 Ga. App. 459, 463, 122 S.E.2d 164, 167 (1961); *see also Ironshore Specialty Ins. Co. v. RPG Hosp., LLC*, 368 Ga. App. 199, 203, 889 S.E.2d 394, 398 (2023) ("[T]he test is not what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean.") (quoting *Am. Strategic Ins. Corp. v. Helm*, 327 Ga. App. 482, 486, 759 S.E.2d 563, 566 (2014)).

Pacific Life contends that Long's "no" answers to question 3(a)(1) of the medical history questionnaires and questions 19(A), 19(C), and 19(D) of the health history questionnaire were false. Doc. 25-2 at 7-9. The Court cannot conclude that Long's answers to questions 3(a)(1) and 19(A) were false. However, the record establishes that Long's answers to questions 19(C) and 19(D) were false as a matter of law.

a. Question 3(a)(1)

Question 3(a)(1) asked: "In the past 10 years, have you been diagnosed, treated, tested positive for, or been given medical advice by a professional health care provider for … Alcoholism or Drug Use." Doc. 25-13 at 10, 22. Long answered "no." *Id*. Pacific Life contends Long should have answered "yes" because Dr. Vaughn noted "alcohol abuse, continuous," Dr. Vaughn advised him to go to a rehabilitation facility for "alcohol abuse," Dr. Fackler advised him to stop drinking, and he was prescribed and filled prescriptions of naltrexone, "which is used to 'help alcoholics stay alcohol-free,'" and Valium, "which 'is used to relieve symptoms of anxiety and alcohol withdrawal.'" Docs. 25-2 at 7-8; 28 at 8.

The Court cannot conclude as a matter of law that Long had "alcoholism." At most, Long's medical records reveal only that from 2012 to 2014, Long struggled with controlling his alcohol intake. *See* Docs. 28-1 at 4; 28-3 at 5-6. None of his medical records state a diagnosis of alcoholism.

Moreover, question 3(a)(1) was ambiguous because it did not define or explain "alcoholism."[7] Thus, Long reasonably could have answered "no" because his relatively

---

[7] Dunbar testified that "it's Pacific Life's position that alcoholism, alcohol use disorder, and alcohol abuse[] are all used interchangeably and synonymous." Doc. 32-6 at 36:5-9. The underwriting guidelines do not say that. *See generally* Docs. 28-5; 28-6. Moreover, as explained below, Long's medical records also do not support a finding as a matter of law that he had "alcohol use disorder" when he applied. In any event,

brief struggle with alcohol years earlier, with no diagnosis, did not constitute alcoholism.
In *Snead*, the trial court found ambiguity in an application question much clearer than
Pacific Life's alcoholism question: "Have you smoked cigarettes in the past 12 months?"
and "HAS THE PERSON PROPOSED FOR INSURANCE: Smoked cigarettes within the
last 12 months?"  231 Ga. App. at 411, 499 S.E.2d at 177.  The trial court thus denied
summary judgment.  *Id*. at 411, 499 S.E.2d at 177.  The Georgia Court of Appeals held:

> We agree with this determination because [the insurer]'s use of "yes" or
> "no" options in its application, combined with its use of the word
> "cigarettes," without emphasizing specifically or delving further into the
> insurance applicant's status as a smoker, may have prompted [the
> insured]'s negative responses based on her subjective belief that, while
> she possibly knew that she had slipped a cigarette or two during the year
> preceding her insurance policy application, [the insurer]'s two "yes" or "no"
> questions were directed to her status as a regular user of "cigarettes."

*Snead*, 231 Ga. App. at 410-11, 499 S.E.2d at 177.  Here, a prospective insured
answering question 3(a)(1) could reasonably and easily conclude that the question
asked whether he had been diagnosed with "alcoholism."  On this record, a reasonable
jury could conclude that Long had never been "diagnosed, treated, tested positive for, or
been given medical advice" for "alcoholism."  Accordingly, the Court cannot say that
Long's answer to question 3(a)(1) was false as a matter of law.

---

when considering the falsity of a representation, as opposed to the materiality of a representation, the
question is how a prospective insured, not an underwriter, sees the question.

b. Question 19(A)[8]

Question 19(A) asked: "In the past 10 years, have you … had treatment or counseling for drugs or alcohol?"  Doc. 25-13 at 29.  Long answered "no."  *Id*.  Pacific Life argues his answer should have been "yes" because Dr. Fackler counseled Long about alcohol "repeatedly over the course of their regular sessions" and prescribed naltrexone and Valium.  Docs. 25-2 at 8-9; 28 at 8-9.

First, it is not clear that Long's answer was false.  He was not "repeatedly" counseled, as Pacific Life contends.  Rather, Dr. Fackler spoke to Long about alcohol during seven of 150 visits.  Docs. 29 at 11; 32-5 at 27-188; 42 at 31:8-21.  And during those seven visits, alcohol was not the only topic of conversation.  *See, e.g.,* Doc. 32-5 at 136 (discussion of his inability to sleep, agitation, and dialysis), 138 (discussion of work hours and energy levels).  Dr. Fackler's notes suggest that Long's periodic alcohol binges were a consequence of stress-induced anxiety and Dr. Fackler focused, successfully it seems, on means to reduce and control Long's anxiety.  *See* Docs. 28-1 at 4; 28-3 at 5-6.  A reasonable jury could conclude that these conversations did not rise to the level of "counseling for alcohol."  As for "treatment," Long filled his naltrexone prescription for 21 tablets *once* on September 3, 2013, and by November 14, 2013, he had decided not to take it anymore because he "want[ed] to do this on [his] own."  Docs. 25-6 at 2; 28-3 at 4.  And a jury could easily conclude that Valium was not prescribed to

---

[8] Blalock argues that "[b]y not raising the allegedly false answer to 19.A. in the rescission letter, Pac. Life has waived its right to rely on that answer to support its decision to rescind."  Docs. 29 at 8; 25-26; 32-3.  However, waiver in the rescission context requires a showing that the insurer acted inconsistent with the defense of rescission.  *Grange Mut. Cas. Co. v. Bennett*, 350 Ga. App. 608, 611-12, 829 S.E.2d 834, 836-37 (2019); *Fla. Int'l Indem. Co. v. Osgood*, 233 Ga. App. 111, 114-15, 503 S.E.2d 371, 374-75 (1998); *State Farm Fire & Cas. Co. v. Jenkins*, 167 Ga. App. 4, 6, 305 S.E.2d 801, 803 (1983).  Blalock cannot make that showing here.  Pacific Life received Blalock's claim, conducted a contestable claim investigation, learned of Long's alleged "misrepresentations," and then returned the premiums and declined Blalock's claim.  Docs. 25-17; 25-24; 25-25; 25-26.

treat "alcohol."  Dr. Fackler, on October 30, 2014, prescribed Long "Valium 10mg one tablet three times daily *as needed for anxiety*."  Doc. 28-3 at 5 (emphasis added).  Dr. Fackler's November 20, 2014 note, upon which Pacific Life relies, confirms that Dr. Fackler was focused on controlling Long's anxiety:

> Discussion was again had concerning the use of pm Valium to help control patient's hypomania as well as his urge to drink alcohol.  He is willing to try pm Valium to help control his level of irritability and agitation .... He does struggle with hypomanic symptoms which ultimately drive him to drink alcohol excessively.  Patient has agreed to try pm Valium for control of his agitation.

Doc. 28-3 at 6; *see* Docs. 28 at 12; 28-2 ¶ 39; 38 at 6.  In short, based on the medical records, the Court cannot say as a matter of law that Long falsely denied he had "treatment" for alcohol.

Second, the "yes" or "no" question was ambiguous.  The application does not define "treatment" or "counseling."[9]  When asked, "Did you see any history of treatment for alcohol abuse by Jimm[ie] Long?," even Dunbar first answered, "Define treatment." Doc. 29-5 at 86:24-87:1.  Indeed, Pacific Life, in its contestable claim investigation, interpreted the records to "recommend" treatment.  Docs. 25-24 at 2; 25-25 at 2-3. Moreover, "counseling for alcohol" from a prospective insured's standpoint may mean counseling specifically for alcohol—not conversations with a psychiatrist treating his anxiety.  Considering the context of "treatment" in the question, a prospective insured reasonably could have interpreted the question to be asking if he ever joined a

---

[9] Swiss Re's underwriting guidelines do not address treatment or counseling for "alcohol," but they do define treatment for "alcohol use disorder," a specific condition which the guidelines define: "Treatment usually consists of counselling sessions that include behavior modification techniques.  These programs include follow-up sessions to monitor progress, and the establishment of a support group such as Alcoholics Anonymous."  Doc. 28-6 at 10.  Applying this definition, Long received no "treatment."  He never received counselling sessions specifically for behavior modification, engaged in progress monitoring, or joined a support group.

rehabilitation group specifically for alcohol and that his two prescriptions he filled once, one of which was prescribed for anxiety, did not amount to "treatment."

Accordingly, the Court cannot say that Long's answer to question 19(A) was false as a matter of law.

### c. Question 19(C)

Question 19(C) asked: "In the past 10 years, have you … been advised by a medical professional to seek treatment for drugs or alcohol?"[10]  Doc. 25-13 at 29.  Long answered "no."  *Id*.  Pacific Life argues his answer should have been "yes" because on August 19, 2013, Dr. Vaughn noted that Long was "advised to go [to] rehab for his alcohol abuse-willingway," a rehabilitation facility.  Doc. 25-1 ¶ 30; 25-3 at 7; 29-1 ¶ 30.

The Court agrees.[11]  Question 19(C) asks a straightforward, factual question and is not subject to interpretation.  As discussed, Long reasonably could have thought he did not have "treatment," but he could not have reasonably denied that he had been advised to get treatment, i.e., "to go [to] rehab for his alcohol abuse."  Doc. 25-3 at 7.  Thus, no reasonable jury could conclude that Long was not advised by a medical professional to seek treatment for alcohol, and his answer was false.

---

[10] Blalock argues Dr. Vaughn and Dr. Fackler did not provide "medical advice," citing an unpublished Eleventh Circuit case.  Doc. 29 at 14-15 (citing *Jones v. Golden Rule Ins. Co.*, 748 App'x 861, 868 (11th Cir. 2018)).  But the term "medical advice" is not at issue here.

[11] The Court rejects Blalock's argument that the terms "advised" and "medical professional" are ambiguous.  Doc. 29 at 13-15.  Neither term is susceptible to multiple meanings.  Merriam-Webster's definitions for "advise" all have the same meaning.  *Advise*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/advise (last visited May 22, 2024).  And a "medical professional" is someone employed in the medical field, i.e., physicians and psychiatrists.  *See Psychiatrist*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/psychiatrist (last visited May 22, 2024) ("a *medical* doctor who diagnoses and treats mental, emotional, and behavioral disorders") (emphasis added); *Physician*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/physician (last visited May 22, 2024) ("a *health-care professional* … who has earned a *medical* degree, is clinically experience, and is licensed to practice *medicine*") (emphasis added).  Accordingly, question 19(C) asked if someone employed in the medical field suggested Long receive treatment for alcohol.

d. Question 19(D)

Question 19(D) asked: "In the past 10 years, have you … been advised by a medical professional to reduce alcohol intake?"  Doc. 25-13 at 29.  Long answered "no." *Id*.  Pacific Life contends he should have answered "yes" because on September 10, 2012, Dr. Fackler "encouraged [him] to stop drinking."  Doc. 28 at 9.

The Court agrees.  Like question 19(C), question 19(D) is not ambiguous, and the records clearly show that on September 10, 2012, Dr. Fackler "encouraged [Long] to stop drinking" and "explained [the] consequences of binge drinking and [that Long] needs to stop drinking."  Doc. 28-1 at 4.  Thus, Long was advised by a medical professional to reduce his alcohol intake.

In sum, Long's "no" answers to questions 19(C) and 19(D) were misrepresentations.

*2. Materiality*

Pacific Life has not shown that Long's misrepresentations were material as a matter of law.

Materiality is usually a jury question, but "where the evidence excludes every reasonable inference except that [the misrepresentation] was material, [the issue becomes] a question of law for the Court."  *Pope*, 297 Ga. App. at 538, 677 S.E.2d at 697 (alterations in original).  Materiality "is an *objective* determination"—"'[a] material misrepresentation is one that would influence a *prudent insurer* in determining whether or not to accept the risk.'"  *Lee v. Mercury Ins. Co. of Ga.*, 343 Ga. App. 729, 741-42, 808 S.E.2d 116, 128 (2017) (quoting *Lively v. S. Heritage Ins. Co.*, 256 Ga. App. 195, 196, 568 S.E.2d 98, 100 (2002)) (emphasis in original).  "'Where the evidence shows

that the insurer would not have issued the policy if it had been aware of [the true facts],
the evidence demands a finding that the omissions or misrepresentations were material
to the acceptance of the risk.'" *Pope*, 297 Ga. App. at 538, 677 S.E.2d at 697 (quoting
*Miller v. Nationwide Ins. Co.*, 202 Ga. App. 737, 738, 415 S.E.2d 700, 701 (1992))
(alterations in original).

To carry its burden, an insurer may produce evidence of "the nature of the
particular misrepresentation, the coverage afforded by the policy, underwriting
guidelines, and/or the negotiations between the parties, in addition to an affidavit from a
company underwriter." *Lee*, 343 Ga. App. at 742, 808 S.E.2d at 129.  However, "an
affidavit from an insurer stating that certain information omitted from an application was
material does not automatically entitle an insurer to void a policy." *Id*. at 742, 808
S.E.2d at 128.  Once the insurer carries its burden of showing that it would not have
issued the policy had it known the truth, the burden shifts to the insured to contradict
that evidence.  *See Nappier v. Allstate Ins. Co.*, 961 F.2d 168, 170 (11th Cir. 1992).

Pacific Life argues Long's misrepresentations were material as a matter of law
because under its own and Swiss Re's guidelines, "no reasonably prudent insurer would
have issued the Policies had it known about Mr. Long's history of alcohol abuse when
coupled with his current alcohol use."  Doc. 25-2 at 11.  The Court disagrees.

First, the opinions of the underwriters and the underwriting experts on the
materiality of Long's misrepresentations are both conclusory and conflicting.  When
Pacific Life denied the claims, it's materiality analysis simply quoted or paraphrased
Pacific Life's underwriting guidelines—"history of alcohol abuse with physician
recommended rehab" and "alcohol abuse with advisement by his physician to seek

treatment." Docs. 25-22 at 2; 25-24 at 2; 25-25 at 2-3. Pacific Life's underwriting

expert, Lynn Patterson, rendered a different opinion—Long's misrepresentations were

material because "he had a history of treatment for alcohol abuse." Doc. 28-13 ¶ 10;

*see* Doc. 28-12 at 7.[12] Blalock's expert, Dolan, addressed in more detail the question of

whether the medical records warranted Pacific Life's finding of material "alcohol abuse."

Doc. 28-10 at 12-17. Dolan concluded that "Long's underwriting profile was not

consistent with the profile of an alcohol abuser as defined by Pacific Life's underwriting

guidance." *Id*. at 13.

　　The array of underwriting opinions illustrates that the real problem is Pacific Life's

underwriting guidelines—they provide no guidance on what constitutes "alcohol abuse"

and what "alcohol abuse" is material.[13] Doc. 28-5. Nor, relevant to Patterson's opinion

that Long had "a history of treatment," do the Pacific Life guidelines define "treatment"

for alcohol abuse. *Id*. The applicable Pacific Life guidelines provide:

**DECISION**

| Rate Class | Criteria |
|---|---|
| Decline | ● Refer to Swiss Re, but note the following **EXCEPTIONS:**<br>　○ Current use with a history of treatment for alcohol abuse<br>　○ Untreated alcohol abuse<br>　○ Multiple DUI/DWIs<br>　○ Use of anti-alcohol medication |

*Id*. at 4 (emphasis in original).

---

[12] Unlike Pacific Life's underwriters, Patterson addressed Swiss Re's guidelines. Docs. 28-12 at 7-10; 28-13 ¶¶ 5, 10-12. Those guidelines are addressed below.

[13] Pacific Life's guidelines list what factors "may be associated with alcohol abuse and should be thoroughly investigated." Doc. 28-5 at 2. But Pacific Life does not point to these factors in arguing that Long's alcohol use constituted alcohol abuse. *See generally* Docs. 25-2; 37. And Long's medical records reviewed at the time of underwriting would not have suggested a presence of any of the factors.

Long acknowledged in his applications that he was a "current alcohol user;" thus, the question is whether he had "alcohol abuse" as that undefined term is used in Pacific Life's underwriting guidelines. Doc. 25-13 at 11, 23, 29. Pacific Life points to Dr. Vaughn's August 19, 2013 notation of "alcohol abuse, continuous" and "advised to go [to] rehab for his alcohol abuse." Docs. 25-2 at 7-8; 25-3 at 3, 7. Factually, there is no evidence that "alcohol abuse" is a medical diagnosis with a specific meaning and there is no evidence of what Dr. Vaughn meant when she wrote "alcohol abuse" in that one note. Certainly, though, other records from that relatively brief period provide a factual description of Long's alcohol use. *See*, *e.g.*, Docs. 28-1 at 4; 28-3 at 5. But Pacific Life's guidelines, unlike Swiss Re's guidelines, shed no light—temporally, quantitatively, or otherwise—on what degree or scope of alcohol use is material. Simply put, with the underwriters at odds and based on Pacific Life's terse guidelines, the Court cannot say as a matter of law that Long's alcohol use from 2012 to 2014 was material alcohol abuse.

Even if Pacific Life had defined material alcohol abuse and even if Long's alcohol use fell within that definition, the record does not establish as a matter of law that he had "untreated alcohol abuse" or that he had a "history of treatment for alcohol abuse." Doc. 28-5 at 4. Considering "untreated alcohol abuse" in its context, it is unclear whether the guidelines refer to *current* untreated alcohol abuse or *past* untreated alcohol abuse. Logically, because "untreated alcohol abuse" follows "history of treatment for alcohol abuse," and the guidelines do not reference "history of untreated alcohol abuse," it follows that the guidelines address untreated alcohol abuse at the

time of application.[14]  *Id*.  Further, if "untreated alcohol abuse" meant alcohol abuse at any time, there would be no reason to distinguish untreated alcohol abuse from treated alcohol abuse—alcohol abuse would be disqualifying regardless of treatment.  Thus, even if Long had alcohol abuse at some point from 2012 to 2014, the Court cannot say as a matter of law that that alcohol abuse was material under Pacific Life's guidelines.

As noted, there is no indication that Pacific Life relied on the Swiss Re underwriting guidelines when it rescinded the policies.  There was no need to as far as Pacific Life was concerned.  Pacific Life's guidelines provided "exceptions" to Swiss Re's guidelines and Pacific Life thought Long's alcohol use fell within those exceptions based on some undefined "alcohol abuse."  Doc. 28-5 at 4 ("Refer to Swiss Re, but note the following EXCEPTIONS.").  However, Pacific Life's underwriting expert, Patterson, did address the Swiss Re guidelines and concluded that Long's misrepresentations were also material under those guidelines.  Docs. 28-12 at 7-10; 28-13 ¶¶ 5, 10-12.  Again, Blalock's expert, Dolan, reached a contrary conclusion.  Doc. 28-10 at 7, 13-14.  Accordingly, the Court examines those guidelines.

Unlike Pacific Life's guidelines, Swiss Re's guidelines address alcohol use in detail.  Doc. 28-6.  Significantly, Swiss Re's guidelines do not define "alcohol abuse."[15]  Rather, materiality under Swiss Re's guidelines turns on the specifically defined condition of "alcohol use disorder."  *Id*.  Although Pacific Life did not find in its

---

[14] It is worth noting that Pacific Life's guidelines provide for a denial where there is "use of anti-alcohol medication."  Doc. 28-5 at 4.  But Pacific Life does not use this to support its argument that there would have been a denial, presumably because Long was not taking naltrexone *at the time of* his application.

[15] At first glance, Swiss Re's guidelines appear to provide a definition under the "What is alcohol abuse?" section.  Doc. 28-6 at 2.  Upon looking closer, however, it becomes clear that Swiss Re did not answer that "question" with a definition.  Rather, they state: "Alcohol consumption is typically subject to social normal and the confines of legal systems.  Alcohol use has the potential to affect acute and chronic health risks, including the cardiovascular, digestive and central nervous system."  *Id*.

contestable claim investigation that Long had "alcohol use disorder," Patterson testified that Long had "alcohol use disorder" in 2012 to 2014 because he met two of 12 criteria for a finding of "alcohol use disorder."  Doc. 28-13 ¶ 11.  But, as Dolan notes, Patterson failed to consider Swiss Re's guidelines as a whole.  Doc. 28-10 at 14.

Swiss Re's guidelines devote nine pages to alcohol use disorder.  Doc. 28-6 at 3-11.  Patterson addressed only the medical definition of alcohol use disorder.  Doc. 28-13.  But the guidelines then proceed to address the underwriting process for evaluating alcohol use disorder.  Doc. 28-6 at 3-11.  The Swiss Re guidelines describe alcohol use disorder as "a chronic relapsing condition characterized by an impaired ability to stop or control alcohol consumption despite adverse health, occupational, and social consequences" and that it "is present when the consumption of alcohol and resulting intoxication interferes with an individual's ability to maintain control over his or her actions, especially those that promote personal health."  *Id*. at 3.  Swiss Re's guidelines also direct underwriters to consider a multitude of factors in determining whether an applicant has alcohol use disorder, including drug use, unstable employment, drunk-driving arrests, the attending physician's statement, frequent absences from a job, and financial difficulties.  *Id*. at 4-11.  Pacific Life makes no argument that Long fits a "chronic relapsing" profile, that Long's consumption of alcohol interfered with his ability to maintain control over his actions, or that Long's medical records show signs of any of the additional factors.

Moreover, Pacific Life ignores the apparent fact, as Dolan points out, that Swiss Re's guidelines concern a potential insured with alcohol use disorder at the time of application.  Doc. 28-10 at 14.  In the "underwriting information" section, Swiss Re's

guidelines provide that if "the proposed insured is a heavy user of alcohol without signs and symptoms of alcohol use disorder *present*, an offer may be possible based on the level of consumption."  Doc. 28-6 at 3. (emphasis added).  To "assess the likelihood of *active* alcohol use disorder" the guidelines direct the underwriter to consider a "*history* of alcohol use disorder."  *Id*. at 7 (emphasis added).  Based on Swiss Re's guidelines and Long's medical records, particularly Dr. Fackler's November 20, 2014 note[16] (the last reference to alcohol issues before Long's 2022 applications), a reasonable jury could find that Long's alcohol use was not material.  Further, for applicants "with a history of heavy alcohol consumption," Swiss Re's guidelines direct underwriters to "seek evidence of addiction."  *Id*. at 3.  Risks associated with heavy-drinking applicants include binge drinking and a lack of "capacity to curtail drinking when it begins to affect health, job, or social relationships."  *Id*.  If an applicant's "alcohol abuse profile includes several of the risk factors," Swiss Re's guidelines direct underwriters to "investigate the possibility of alcohol use disorder and develop information about the applicant's drinking pattern."  *Id*. at 4.  The "most important tool used in identifying alcohol abusers," according to Swiss Re, is the applicant's attending physician's statement.  *Id*.  Blalock argued at length in his response that Swiss Re's guidelines address alcohol use disorder "present" at the time of application, and Pacific Life was essentially silent.  Doc.

---

[16] The "medications/treatment plan" section of this note provided:

> Patient was seen in follow up appointment today.  He appears to be stable and doing well. He is pleased with the progress of his company and current projects.  He does struggle with hypomanic symptoms which ultimately drive him to drink alcohol excessively.  Patient has agreed to try pm Valium for control of his agitation.  He is aware that he is not to combine Valium with alcohol.  He is pleased with the progress of his company and reports no acute crises.  He is in agreement with treatment plan and plans were made to meet on a weekly basis.  Patient was in agreement with this.

Doc. 28-3 at 6.

32-2 at 16-18.  Pacific Life devoted one footnote to Swiss Re's guidelines in its reply. Doc. 38 at 8 n.6.

In short, even if Long had "alcohol use disorder" between 2012 and 2014, the Court cannot say as a matter of law that Swiss Re's guidelines required the rejection of his applications.

In sum, the Court cannot conclude as a matter of law that based on Pacific Life and/or Swiss Re's guidelines, "the evidence excludes every reasonable inference except that [the misrepresentation] was material."  *Pope*, 297 Ga. App. at 538, 677 S.E.2d at 697.[17]

## C. Bad Faith

Pacific Life argues that "even if the Court determines there is a dispute of material fact as to [Blalock]'s breach of contract claim, Pacific Life is still entitled to summary judgment on [Blalock]'s bad faith claim because Pacific life had reasonable grounds to contest the claim to the Policies' death benefits."  Doc. 25-2 at 18.  Blalock contends the issue of bad faith must "be resolved by the jury."  Doc. 29 at 19.

"Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact." *Lee*, 343 Ga. App. at 748, 808 S.E.2d at 133 (quoting *Am. Safety Indem. Co. v. Sto Corp.*, 342 Ga. App. 263, 273, 802 S.E.2d 448, 456 (2017)).  "Rather, bad faith is shown by 'evidence that under *the terms of the policy* upon which the demand is made and

---

[17] The Court notes that Pacific Life does not argue that Long's premium would have been higher had he been truthful.  Its entire argument for summary judgment on materiality is based upon its assertion that it would have *declined* Long's applications.  Doc. 25-2 at 11 ("Both sets of guidelines confirm that no reasonably prudent insurer would have issued the Policies."), 13 ("Pacific Life would not have issued the Policies."), 16 ("Pacific Life would not have issued the Policies.").  Perhaps that is because Pacific Life's investigation revealed no evidence of any issues with alcohol after 2014.  Accordingly, the Court does not address this issue.

under the facts surrounding the response to that demand, the insurer had no "good cause" for resisting and delaying payment.'" *Old Republic Nat'l Title Ins. Co. v. RM Kids, LLC*, 337 Ga. App. 638, 650, 788 S.E.2d 542, 553 (2016) (emphasis in original) (*quoting Lawyers Title Ins. Corp. v. Griffin*, 302 Ga. App. 726, 731, 691 S.E.2d 633, 637 (2010)). "Ordinarily, the question of bad faith is one for the jury." *Am. Safety Indem. Co.*, 342 Ga. App. at 273, 802 S.E.2d at 457. "However, 'when there is no evidence of unfounded reason for the nonpayment, *or* if the issue of liability is close, the court should disallow imposition of bad faith penalties.'" *Id*. (quoting *Amica Mut. Ins. Co. v. Sanders*, 335 Ga. App. 245, 250, 779 S.E.2d 459, 463 (2015) (emphasis in original)).

Here, the question of bad faith should not go to the jury. A reasonable jury, on this record, could find that Long materially misrepresented his alcohol use in his applications. His answers to questions 19(C) and 19(D) were false as a matter of law, and a reasonable jury could find his answers to questions 3(a)(1) and 19(A) were also false. While Pacific Life's underwriting guidelines are not a model of clarity, there is clearly evidence, upon which Pacific Life relied, that Long had a history of excessive drinking, which is material to life insurance underwriting. *See Flynt v. Life of South Ins. Co.*, 312 Ga. App. 430, 438, 718 S.E.3d 343, 349 (2011) ("An insurer's refusal to pay is not frivolous or unfounded if is predicated upon 'a reasonable question of law or a reasonable issue of fact,' even if the insurer's position ultimately is rejected by a court or jury.") (quoting *Colonial Life & Accident Ins. Co. v. McClain*, 243 Ga. 263, 265, 253 S.E.2d 745, 746 (1979)). Thus, Pacific Life had reasonable grounds to contest Blalock's claim and good cause for resisting payment. Accordingly, Pacific Life's motion for summary judgment on Blalock's bad faith claim is **GRANTED**.

**IV. CONCLUSION**

For the above reasons, Pacific Life's motion for summary judgment (Doc. 25) is

**GRANTED** as to Blalock's bad faith claim and **DENIED** as to Blalock's breach of

contract claim and its *Daubert* motion (Doc. 26) is **GRANTED in part**.  Dolan's opinion

regarding the consideration of ten years' worth of medical records is **EXCLUDED**.  Her

other opinions are limited pursuant to the parties' consent.

      **SO ORDERED**, this 9th day of July, 2024.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT